**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

LINDA WHITE,

   Plaintiff,

            :   Case No. 3:03-cv-228

            :   District Judge Thomas M. Rose
 -vs-             Chief Magistrate Judge Michael R. Merz

INTERNATIONAL BUSINESS
 MACHINES, et al.,

            :

   Defendants.

**REPORT AND RECOMMENDATIONS**

   Plaintiff brought this action against her former employer, International Business Machines Corp. ("IBM"), and her last supervisor at IBM, John Grantman in his individual capacity, claiming race discrimination in violation of Title VII of the 1964 Civil Rights Act, race discrimination in violation of Ohio Revised Code § 4112.99, intentional infliction of emotional distress, and violation of IBM's customs, practices and/or policies. Discovery was completed as of November 30, 2004, and the case is now before the Court on IBM's post-discovery summary judgment motion (Doc. No. 27).

**SUMMARY JUDGMENT STANDARD**

   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn

1

therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States*

2

*v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

The facts set forth in this Report are admitted or established by evidence competent under Fed. R. Civ. P. 56(e) and not controverted by opposing competent evidence.

3

**Analysis**

Plaintiff Linda White is an African American who began her employment with IBM in Texas in 1977. She was continuously employed by IBM until terminated in 2002, having become an Availability Manager[1] in October, 1992, when she moved to Dayton, Ohio. In that capacity, she worked directly with IBM customers on external contracts or performed her job functions on internal IBM contracts. The external contracts, of course, directly generated revenue for IBM ("green dollars") whereas the internal contracts were billed to other divisions of IBM ("blue dollars").

Persons in Plaintiff's job position were assigned target utilization rates, essentially a number of billable hours which the employee was expected to bill. For example, if there were 160 hours of possible billable time available in a month (four forty-hour weeks), a person billing 80 hours would have a utilization rate of 50%. Plaintiff's target utilization rate was 65% in 2000 and 70% for 2001 and 2002. Plaintiff makes no claim of race discrimination in the setting of these rates. The utilization rates were important in determining job performance, as Plaintiff admits she knew. In fact, she fully understood that she could lose her job if she failed to meet her target.

During 2000 and 2001, the majority of Plaintiff's billable hours came from her work on an internal "Lunch and Learn" contract which involved preparing educational programs to offer to other Availability Managers by teleconference during the lunch hour. During the same period of time, Plaintiff had one external contract with Miami Valley Hospital on which she billed ten hours each month. Nevertheless, combining the hospital contract and the Lunch and Learn program, Plaintiff exceeded her target utilization rates for 2000 and 2001.

However, around the end of 2001, IBM substantially cut the funding for the Lunch and Learn program and Plaintiff was advised she would be able to bill only four hours each month to that

---

[1] Apparently the job title was changed to Consulting I. T. Specialist in August, 2001, but the job functions remained the same.

contract. There is no allegation that the funding cut decision was somehow racially motivated. Plaintiff learned of the cut January 15, 2002, and understood she would not be able to meet her utilization rate unless she obtained more work. For January, 2002, her utilization rate dropped to 5%, 43% below the next lowest comparable IBM employee.

Because her utilization rate was low, Plaintiff's name began to appear on internal management reports identifying employees with few billable hours. These reports were reviewed during weekly conference calls among the Practice Leader (Kevin Courtney), the Resource Deployment Manager (Odette Martinez), and the Professional Development Manager (first Linda Graves and later Defendant Grantman) for the IBM Great Lakes South territory, referred to by IBM as a "geography." The purpose of the conference calls was to make certain all employees were actively working and to find work for employees who had low billable hours. Knowing that she was appearing on these reports, Plaintiff let Mr. Grantman know in February, 2002, that she could not be out of town for work more than two or three days per week because she is a single parent.

Defendant Grantman became Plaintiff's Professional Development Manager in February, 2002, and promptly advised her that she could be discharged if she did not find work. Plaintiff continued to search actively within the company, contacting numerous IBM employees during February and March, but without success. At the end of February, her utilization rate was 18%, while the next lowest comparable employee was at 57%.

Sometime prior to March 20, 2002, Kevin Courtney decided that Plaintiff would have to be terminated if her utilization rate did not improve. Grantman agreed and notified her on that date that she would be terminated as of April 30, 2002, unless she obtained "full time engagement within ITS" or an alternate position elsewhere within IBM. She continued her internal search, but remained unsuccessful. At the end of March, her utilization rate was 21%; by the end of April it had fallen back to 19%. She was discharged at the end of April, 2002, and has not been replaced.

5

## Generally Applicable Law

In a Title VII case, the employee has the initial burden of producing evidence of a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 61 L. Ed. 2d 207 (1981); *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir. 1991); *Gagne v. Northwestern Nat. Ins. Co.*, 881 F. 2d 309 (6th Cir. 1989). The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas, supra; Burdine, supra.* However, the burden remains on the employee throughout the case to prove by a preponderance of the evidence that he or she was the victim of intentional discrimination. *Burdine, supra.; St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Ohio courts follow federal law in interpreting Ohio's anti-discrimination statutes. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Commission*, 66 Ohio St. 2d 192 (1981). Therefore, in deciding Plaintiff's claim against IBM under Ohio Revised Code § 4112.99, the Court should employ the same standards as employed in deciding her Title VII claim. Supervisors are not individually liable under Title VII. *Wathen v. General Electric Co.,* 115 F. 3d 400, 406, (6th Cir. 1997). However, an individual supervisor/manager may be held jointly and severally liable with the employer for discriminatory conduct in violation of Ohio Revised Code Ch. 4112. *Genaro v. Central Transport, Inc*., 84 Ohio St. 3d 293, 703 N.E. 2d 782 (1999). Therefore the Court considers claims against Defendant Grantman only under Ohio Revised Code § 4112.99.

The essential factual inquiry in a case of alleged employment discrimination under Title VII is "whether the defendant intentionally discriminated against the plaintiff." *United States Postal Service Board of Governors v. Likens*, 460 U. S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); "the ultimate burden of persuading the trier of fact that the defendant intentionally

6

discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U. S. 248, 253, 101 S. Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In a "disparate treatment" employment discrimination case, proof of discriminatory motive is an essential element of the plaintiff's proof. *International Brotherhood of Teamsters v. United States,* 431 U. S. 324, 335 n. 15, 97 S. Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The plaintiff thus must prove (1) differences in treatment, and (2) a discriminatory motive on the part of the employer. *Beaven v. Commonwealth of Kentucky*, 783 F.2d 672 (6th Cir.1986).

The general rules governing the order and allocation of proof in an individual, non-class action alleging that an employment decision was discriminatory are set forth in *McDonnell Douglas Corp. v. Green,* 411 U. S. 792, 800-02, 93 S. Ct. 1817, 1823-24, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* analytical framework is to be used in a disparate treatment case. *Galbraith v. Northern Telecom, Inc.*, 944 F.2d 275, 279 (6th Cir.1991). To establish a prima facie case of disparate treatment, a plaintiff is required to show 1) that he or she is a member of a protected class, 2) that a similarly situated non-protected persons received dissimilar (better) treatment, and 3) that sufficient evidence exists from which the Court can find a causal connection between race and the dissimilar treatment. *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1270 (6th Cir.1986).

Where a plaintiff alleges disparate treatment and does not provide direct evidence of racial animus, courts " 'require indirect evidence from which an inference of discriminatory motive may be drawn, namely comparative evidence demonstrating that the treatment of plaintiff differs from that accorded to otherwise "similarly situated" individuals who are not within the plaintiffs protected group'." *Shah v. General Electric Co*., 816 F.2d 264, 268 (6th Cir.1987) (quoting B. Schlei & P. Grossman, EMPLOYMENT DISCRIMINATION LAW, at 1291 (2d ed. 1983). It is the plaintiff's burden to establish a similarity between his or her conduct and the conduct of other employees outside his or her protected class who she claims were treated differently. *Beaven*, 783 F.2d at 625-76.

7

Where a plaintiff alleges that employees outside of her protected class were treated differently, the difference in treatment is probative of discrimination only if the employees were so similarly situated to the plaintiff that the most likely reason for treating the plaintiff differently was her race. *See, Furnco Construction Co. v. Waters*, 438 U. S. 567, 577, 98 S. Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If nondiscriminatory explanations will account for the differences in treatment as readily as, for example, a plaintiff's race or sex, she has not shown that the most probable explanation is her race or sex. *See, Texas Dept. of Community Affairs,* 450 U.S at 258, 101 S. Ct. at 1096 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")

> Employees are not 'similarly situated' merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have been subjected to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline of it.

*Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y.1986), *affd without op.,* 814 F.2d 653 (2d Cir.1987), cited approvingly in *Mitchell v. Toledo Hospital,* 964 F. 2d 577 (6th Cir. 1992). For example, a different supervisor can suggest a basis other than sex or race for the difference in treatment received by two employees. *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1271 (6th Cir.1986). *See also, Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989); *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 606 (8th Cir.1983), (different disciplinary measures distinguished because different supervisory personnel were involved); *Thomas v. Florida Power & Light Co.*, 532 So.2d 1060, 1988 WL 142151 (S.D.Fla.1988) (plaintiff not similarly situated to comparative employee because they had different supervisors and worked at different facilities); *Lynch. v. Dean*, 1985 WL 56683 (M.D.Tenn.1985), *rev'd on other grounds,* 817 F. 2d 380 (6thCir.1987) (proof that plaintiff was disciplined more severely than workers under supervision of another foreman did not aid plaintiff in showing she was victim of discrimination); *Talley v. U. S. Postal Service*, 33 FEP

Cases 233, 238 (E.D.Mo.1982), *aff'd*, 720 F.2d 505 (8th Cir.1983) (none of employees worked for plaintiff's supervisor, whose motivation was at issue; therefore, employees to whom plaintiff compared herself were not similarly situated); *Williams v TWA, Inc,* 507 F.Supp. 293 (W.D.Mo.1980), *aff'd in part rev'd in part*, 660 F.2d 1267 (8th Cir.1981) (evidence of disparate treatment of little probative value where disciplinary measures were imposed by different supervisors at different domiciles).  The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; rather, they must be similar in "all the relevant aspects."  *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F. 3d 344 (6th Cir. 1998), citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F. 3d 796 (6th Cir. 1994).

If the plaintiff succeeds in establishing a prima facie case, an inference or a rebuttable presumption of discrimination is created and the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp*., 411 U. S. at 802, 93 S. Ct. at 1824; *Texas Dept. of Community Affairs*, 450 U.S. at 253, 101 S. Ct. at 1093.

The defendant can rebut the presumption of discrimination by producing some "admissible evidence which would allow the [court] rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs,* 450 U.S. at 257, 101 S. Ct. at 1095. The defendant does not have the burden of persuading the court that it was actually motivated by the proffered nondiscriminatory reasons. *Board of Trustees of Keene State College v. Sweeney,* 439 U. S. 24, 25, 99 S. Ct. 295, 295, 58 L.Ed.2d 216 (1978). The defendant must only demonstrate that a genuine issue of fact is raised by the evidence as to the reason for the employment decision in order to meet its burden of going forward. *Texas Dept. of Community Affairs*, 450 U. S. at 254-55, 101 S. Ct. at 1094.

The defendant has no obligation to prove by a preponderance of the evidence the existence

of nondiscriminatory reasons for its decision. Rather, a plaintiff's prima facie case of discrimination will be rebutted if the employer simply articulates-not proves-a legitimate, nondiscriminatory reason for its action. *Texas Dept. of Community Affairs,* 450 U. S. at 257-58, 101 S. Ct. at 1095-96.

If the defendant meets its burden of going forward, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U. S. at 804, 93 S. Ct. at 1825; *Simpson v. Diversitech General, Inc*., 945 F.2d 156, 158-59 (6th Cir. 1991); *Sims v. Cleland*, 813 F.2d 790, 792 (6th Cir.1987). To demonstrate pretext, a plaintiff may show that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Carter v. University of Toledo*, 349 F. 3d 269(6th Cir. 2003), quoting *Seay v. Tennessee Valley Auth.*, 339 F. 3d 454, 463 (6th Cir. 2003).

The plaintiff may establish that the reasons stated are pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs*, 450 U.S. at 256, 101 S. Ct. at 1095. A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. The Kroger Co.,* 319 F.3d 858 (6th Cir. 2003), quoting *Dews v. A.B. Dick Co.,* 231 F. 3d 1016, 1021 (6th Cir. 2001).

Title VII was not intended to "diminish traditional management prerogatives." *Steelworkers v Weber,* 443 U. S. 193, 207, 99 S. Ct. 2721, 2729, 61 L.Ed.2d 480 (1979); *Wrenn v. Gould,* 808-F.2d 493, 502 (6th Cir.1987). It does not require the employer to restructure its employment practices to maximize the number of minorities and women hired or retained. *Furnco Construction*

*Corp.*, 438 U.S 567, 577-78, 98 S. Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *cited in Texas Dept. of Community Affairs*, 450 U.S at 259, 101 S. Ct. at 2096. Federal courts are not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies or private employers, *Bishop v. Wood*, 426 U.S 341, 349, 96 Sect. 2074, 2079, 96 S. Ct. 2074 48 L.Ed.2d 684 (1976), and federal statutes prohibiting discrimination are not "intended as the vehicle for general judicial review of business decisions." *Douglas v. Anderson*, 656 F.2d 528 (9th Cir.1981).

Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "Title VII addresses discrimination." *Ferguson v. Veterans Administration*, 723 F.2d 871 (11th Cir. 1984). "Title VII is not a shield against harsh treatment at the workplace." *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir.1981) [disapproved on other grounds by *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S. Ct. 1781, 72 L. Ed. 2d  66 (1982)].

The issue in a discrimination case is not whether the basis on which the employer acted in taking a personnel action is "sound"; rather, the issue is whether the reasons articulated by the employer are a pretext for discrimination. *In re Lewis*, 845 F.2d 624, 633 (6th Cir.1988) (emphasis in original). *See also, Nix v. WLCY Radio*, 738 F.2d 1181, 1187, *reh'g denied (en banc),* 747 F.2d 710 (11th Cir.1984) ("Title VII does not require the employer to have good cause for its decisions. An employer may [refuse to promote a person] for a good reason, a bad reason, a reason based on erroneous facts or for no reason at all, as long as its action is not for a discriminatory reason.").

**Application of the Law to this Case**

**Racial Discrimination**

Plaintiff asserts that she was qualified for her position and Defendant does not dispute this portion of the prima facie case. Nor is there any dispute that Plaintiff is a member of a protected class by virtue of being African American. Once Plaintiff was notified of the loss of funding for the Lunch and Learn program, she realized it was her responsibility to look for other work which would produce billable hours. She did so and there appears to be no dispute among the parties that she was diligent and cooperative with management in the search. During the search she notified Mr. Grantman that she could not be out of town more than two or three days per week. The Court has not been advised of any positions which she could have filled but which were not offered because of this travel limitation. She applied for some sixteen different positions from February to April, 2002, but did not get any of them. She is not claiming, however, that failure to employ her in one of these positions was the result of racial discrimination against her, i.e., that the position was filled by someone who was not African American because of race. Indeed, the Court has not been given any analysis of the racial composition of the group of people chosen for these various positions.

There is also some discussion in the motion papers about the match of skill sets between applicants and positions. This discussion is not fine-grained enough to permit much analysis. That is, there is no dispute that Ms. White was generally qualified for the position she held, but there is no evidence about possible sub-sets of skills within that job classification which might have better suited her for certain other positions, nor any description of the sub-sets of skills needed for those positions. The Court is aware generally that persons who may be highly qualified in one area of computer hardware or software support may be completely unqualified to work in another area. However, neither party has offered any evidence on how this general phenomenon might have

12

affected Plaintiff's job search within IBM during the first quarter of 2002.  The Court, therefore, assumes in the absence of such evidence that Plaintiff was qualified for the positions for which she applied and, also in the absence of any evidence of racial discrimination in these particular choices, that she was not chosen for reasons other than her race.

The crux of Ms. White's disparate treatment claim is that she was not given as much time to find another IBM position as three Caucasian Availability Managers with whom she compares herself, Joyce Cramer, Carla Grogan, and Clyde Gavin.  She asserts that these employees were subject to the same supervisors and had the same target utilization rates, which IBM does not contest.  The uncontradicted evidence demonstrates the following actual utilization rates for these four employees for the first third of 2002:

| **Employee** | **January 2002** | **February 2002** | **March 2002** | **April 2002** |
|:---:|:---:|:---:|:---:|:---:|
| Cramer | 64% | 68% | 76% | 78% |
| Gavin | 67% | 69% | 69% | 68% |
| Grogan | 60% | 72% | 76% | 74% |
| White | 5% | 18% | 21% | 19% |

These highly-disparate utilization rates show that Cramer, Gavin, and Grogan were not similarly situated to Plaintiff as of the time she was terminated in the critical job aspect of having sufficient billable hours.

Furthermore, Plaintiff does not have admissible evidence that any of these three alleged comparators in fact was given more time "on the bench" than she was.  As to both Cramer and Gavin, she testified she did not know how much time they were given (Pl. Depo. at 134, 136-37), nor has her counsel cited any other admissible evidence in the record of such amounts of time.  As Defendants point out, Plaintiff's source for what information she does have is inadmissible hearsay by Gavin and Cramer – what those persons told Plaintiff.  Plaintiff offers no argument as to any

13

hearsay exception which might make these statements admissible.[2]

Alternatively, Ms. White argues that IBM could not tell from her first quarter results what her utilization would be for the entire year and therefore the termination was too hasty. It is certainly intuitively obvious that a person with a low utilization rate in January (because a time-consuming contract has just ended) may indeed find a new contract and get her utilization rate back up by the end of the year. But nothing compelled IBM to give the Plaintiff an entire year to do that. Nor does she offer any evidence that similarly-situated non-minority Availability Managers or persons in other comparable positions were given a whole year to improve their productivity. In other words, it may not have been sound management practice for IBM to give Ms. White so little time "on the bench," but bad management does not equate to racial discrimination.

Plaintiff testified to her perception "that she was not getting good or premier accounts in Dayton, Cincinnati, or Columbus because of her race and because she was not part of a 'good ole boy' network." (White Depo. at 109, 113, quoted in Memorandum in Opposition at 9.) However, in the absence of some comparative data – who got what contracts when – Ms. White's perception is completely conclusory. That is, she does not offer data upon which an outside observer could confirm or disconfirm her perception.

Again, Ms. White testified that it was her perception that she was taken off an insurance account in Cincinnati in 2000 or 2001 and it was given to someone else because of her race. The only evidence she offers to corroborate this is the fact that she is African-American and the person to whom the contract was given was not. But during 2000 and 2001, she had work from IBM which enabled her to exceed her target utilization rate for those years. She also complaints of the fact that accounts of a Mr. Jack were given to Joyce Cramer in 2000 or 2001, instead of to her, but again this

---

[2] Plaintiff's own statement about what Cramer and Gavin said is itself hearsay, but admissible, since Fed. R. Civ. P. 56 specifically permits deposition testimony to be considered on a summary judgment motion. However, that Rule does not provide an exception for hearsay within hearsay.

14

was at a time when she was fully utilized. She made no complaint in either 2000 or 2001 that these two decisions were racially motivated, nor does she offer any proof that the other contracts were somehow "better" than the Lunch and Learn contract which she had. To some extent, her own testimony provides a non-racial explanation of why Cramer was given the contracts: she admits that at the time (2000-2001) Cramer was underutilized while Plaintiff was exceeding her target rate.

Ms. White testified to her perception that an inquiry by a former manager, Ralph Benson, about whether she could take a contract at Evanston (Illinois) Northwest Health Care was based on her race, but again her perception is purely conclusory: she offers no evidence upon which an outside observer could reach the same conclusion.

Plaintiff elicited an admission from Defendant Grantman that Ms. White "was the only band nine[3] level Availability Manager/I.T. Specialist who was terminated under his supervision during 2002" and she was the only African-American under his supervision. (Memorandum in Opposition at 18.) That being so does not satisfy Plaintiff's burden of establishing a prima facie case because she has not shown any of the other Availability Managers/I.T. Specialists had utilization rates anywhere near as low as hers.

Plaintiff claims that she can show management's reason for terminating her – that she could not find other work because her skills were not in demand – is a pretext because she was awarded stock options in January, 2002, because of her critical skills. However, this does not establish pretext and no reasonable jury could find that it does because she and managements tried to "sell" her skill set during the first quarter of 2002, she did not get any of the positions for which she applied, and she has offered no proof that those positions were awarded on a racial basis.

Finally, Plaintiff asserts there is a genuine issue of material fact whether she should have

---

[3]The band level apparently refers to salary ranges.

15

been terminated for low utilization at all. (Memorandum in Opposition at 27). Again, this is an attack on IBM's business judgment – it might have been well advised to let Ms. White and other similarly situated employees sit on the bench for a year instead of a quarter. But Title VII was enacted to compensate victims of racial discrimination, not victims of bad business judgment. There is simply no proof that IBM decided to evaluate Ms. White's performance on the basis of the first quarter of 2002 rather than the whole year as a way of discriminating against her on the basis of her race.

Plaintiff is unable to establish a prima facie case of race discrimination. Therefore her claims against IBM under Title VII and Ohio Revised Code § 4112.99 and her claims against John Grantman under the latter statute should be dismissed.

## Intentional Infliction of Emotional Distress

In recognizing the tort of intentional infliction of emotional distress in Ohio, the Ohio Supreme Court adopted Restatement of the Law 2d, Torts 2d, §46, and comment d to that section which reads:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected

> and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harvard Law Review 1033, 1053 (1936).

*Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 453 N.E. 2d 666, (1983).

In order to recover on an action for the intentional infliction of serious emotional distress four elements must be proved: 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and 4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person can be expected to endure it. *Miller v. Currie*, 50 F. 3d 373 (6th Cir. 1995); *Pyle v. Pyle,* 11 Ohio App. 3d 31, 34, 463 N.E.2d 98, 103 (Cuyahoga Cty. 1983) (citation omitted); *Bellios v. Victor Balata Belting Co*., 724 F. Supp. 514, 520 (S.D. Ohio 1989).

The emotional distress required must be both severe and debilitating. *Paugh v. Hanks*, 6 Ohio St. 3d 72, 451 N.E. 2d 759 (1983). While expert medical testimony is not an absolute necessity in every case, many Ohio courts have dismissed claims for emotional distress by plaintiffs who never sought medical assistance. *Dickerson v. Int'l United Auto Workers Union*, 98 Ohio App. 3d 171, 648 N.E. 2d 40 (Cuyahoga Cty. 1994). A trial court may determine whether a complainant has stated a cause of action for tortious emotional distress by ruling whether the emotional injury alleged is serious as a matter of law. *Id.* (citation omitted). Thus a number of courts have rejected specific complaints as not causing severe or debilitating emotional distress. *Id., citing, Gagne,*

*supra.* (sleeplessness, withdrawal, and "not the same person she was" is not of sufficient severity); *Jones v. Washington,* 67 Ohio App. 3d 176, 586 N.E. 2d 228 (Lucas Cty. 1990) (recurring nightmares did not constitute showing of sufficient psychic injury); *McCarthy v. Cleveland Hts.,* 65 Ohio App. 3d 216 (Cuyahoga Cty. 1989) (depression requiring psychological counseling following son's suicide was not sufficiently severe); *Lynn v. Allied Corp.,* 41 Ohio App. 3d 392, 536 N.E. 2d 25 (Cuyahoga Cty. 1987) (distraught and hysterical feelings, crying, and elevated blood pressure not sufficiently serious).

The Sixth Circuit has recognized the propriety of applying this standard on summary judgment:

> To the extent that Miller suggests a district court judge cannot rule that, as a matter of law, certain conduct does not rise (or sink) to the extreme and outrageous level required to state a claim for intentional infliction of emotional distress, she attempts to prove too much. It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss. *See, e.g., Rogers v. Targot Telemarketing Servs.,* 70 Ohio App. 3d 689, 591 N.E. 2d 1332, 1333, 1336 (1990)(treating plaintiff's allegations that she was falsely promised continued employment with the intention of causing her to detrimentally rely on the assurances as insufficient to qualify as extreme or outrageous); *Baab v. AMR Serv. Corp.*, 811 F. Supp. 1246, 1270 (N.D. Ohio 1993)(stating that co-workers' display of photographs of scantily clad women and plaintiff's receipt of pornographic "sex toys" was not intolerable in a civilized society and therefore not extreme or outrageous).

*Miller v. Curie*, 50 F. 3d 373 at 377-78 (6th Cir. 1995).

Plaintiff has offered no facts which, if proved to a jury, would permit the jury reasonably to conclude that she had been subjected to the intentional infliction of emotional distress. There is no evidence her termination was rude or accompanied by insult in any way. While loss of a long-term job may be expected to cause serious anguish, the proof outlined above shows that Defendants made

18

the decision on a business basis and not with the purpose of imposing anguish on Plaintiff.

### Violation of IBM's Customs, Practices and/or Policies

Presumably, Plaintiff intended by this claim to assert an implied contract of employment which was violated by her termination. In her Memorandum in Opposition, she does not attempt to show that any such contract existed.

### Conclusion

There are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. Their summary judgment motion should be granted and the Complaint herein dismissed with prejudice.

March 21, 2005.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond

to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).